# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

TIMOTHY E. SITES,                    :

     Plaintiff,                    :          Case No. 3:11cv00312

 vs.                                   :          District Judge Thomas M. Rose
                                  Magistrate Judge Sharon L. Ovington

MICHAEL J. ASTRUE,                    :
Commissioner of the Social
Security Administration,              :

     Defendant.                    :

## REPORT AND RECOMMENDATIONS[2]

## I.  <u>Introduction</u>

Plaintiff Timothy E. Sites brings this case *pro se* challenging the Social

Security Administration's denial of his applications for Disability Insurance Benefits

(DIB) and Supplemental Security Income (SSI).  This Court has jurisdiction to

review the administrative denial of Plaintiff's DIB and SSI applications.  *See* 42

U.S.C. §§ 405(g), 1383(c)(3).  The case is before the Court upon Plaintiff's

Complaint and attached Exhibits (Doc. #2), the certified administrative record (Doc.

---

[2]  Attached hereto is a NOTICE to the parties regarding objections to this Report and
Recommendations.

#7), Plaintiff's Memoranda and Exhibits (Doc. #s 8, 11, 13), the Commissioner's

Reply (Doc. #14), and the record as a whole.

Plaintiff seeks "approval of his disability claim" (Doc. #11, PageID at 818)

or, in other words, he seeks a reversal of the Administrative Law Judge's decision

denying his DIB and SSI applications and a remand of this matter to the Social

Security Administration for payment of DIB and SSI.  The Commissioner contends

that an Order affirming the Administrative Law Judge's decision is warranted.

## II.    Background

### A.    Plaintiff And His Testimony

Plaintiff filed his DIB and SSI applications in 2008, asserting that he had

been unable to work beginning on October 1, 2002 due to "[t]hyroid problem, right

leg injury, head injuries, left leg surgery, depression, cracked skull, [and] injuries

from multiple accidents."  (Doc. #7, PageID at 206).

Plaintiff was 46 years old on the date his claimed disability began and was

therefore considered a "younger person" for Social Security purposes.  *See* 20

C.F.R. §404.1563(c).  He was 52 years old on the date the Administrative Law

Judge (ALJ's) issued his decision and was therefore considered a "person closely

approaching advanced age" for Social Security purposes.  *See* 20 C.F.R.

§404.1563(d).  He has a high school education and completed one year of

2

vocational training (truck driving).  (Doc. #7, Page ID at 330).  His past

employment included work as a jackhammer operator, a mason tender, an extruder

operator, and a construction worker.

During the ALJ's hearing in May 2010, Plaintiff was represented by counsel.

Plaintiff testified that he had last worked in October 2002 as a "mason tender,

carrying cement blocks and throwing mud … concrete."  (Doc. #7, PageID at 83).

He stopped working at that time due to carpal tunnel syndrome and a knee injury,

which required surgery.  *Id*.  When asked why he could not work at the time of the

ALJ's hearing, Plaintiff explained, "Dr. [Bohinc] said I might need knee surgery on

my right knee pretty soon.  And my circulation's getting bad in my right leg.  My

attention span's not so great, I guess.  I mean, I can … do labor, I guess … if

somebody tells me they want something done.  It all depends on what it is."  *Id*. at

83-84.

Plaintiff testified that he suffers from depression, causing him to isolate

himself from others.  *Id*. at 84.  He takes several prescription medications:  Lexapro,

Depakote, and Seroquel.  As to Seroquel, a medication generally used to treat

disturbed or unusual thinking,[1] Plaintiff testified, "I was kind of seeing stuff

sometimes.  Like I was telling them I had thought I seen a bug on my hand.  Or, I

---

1 *See* http://www.nlm.nih.gov/medlineplus (search for Seroquel in Drugs & Supplements database).

did have a real ant on my hand the other hand [sic] and I, you, got rid of it, but …
it's like, it seems like I had ants, you know.  You know ... I don't know if that's kind
of phobic or whatever.... " *Id*.  Plaintiff also had difficulty with his attention span
and had "trouble finishing stuff."  *Id*. at 87.  And he had been diagnosed with
bipolar disorder.  When he feels depressed, he thinks that people are against him or
judging him – "like they hate you before you even know them."  *Id*. at 88.  He
consequently has difficulty trusting people.  *Id*.

As to his physical pain, Plaintiff testified that he "got hit by a truck and it tore
that calve off like 25 years ago .…" *Id*.  He was told that he would probably have
bad circulation as he aged.  He also testified that he felt pain in his left knee "when
it gets damp."  *Id*. at 84-85.  He is limited to walking to a couple of hours; he gets
tired easily and his "legs start aching real bad."  *Id*. at 85.  He estimated that he
could lift over 20 pounds but he did not know how many times he could lift this
much.  And he noted it was hard for him to bend down because he could not
repeatedly bend his left leg.

Plaintiff was married at one point for 11 months but was separated from his
wife.  He lived at a "men's group house."  (Doc. #7, PageID at 81-82).  As to his
chores, he cleaned the toilet and washed some dishes.  He did not associate with
people.  Although he knew some people, he did not visit anyone in their home.

During a typical day, Plaintiff would get up and go to the Alpha Center ("like a community soup kitchen") to eat breakfast.  He would return to the group home and read, then go back to the Alpha Center for lunch.  He attended Alcoholics' Anonymous or Narcotics' Anonymous meetings and later "walked around some" or went to counseling at Shelby Counseling Center for group therapy.  *Id*. at 86-87.  He liked to read books during the evenings, but he had difficulty concentrating if someone was making noise.  He also had difficulty concentrating when someone was telling him to do something, and he had trouble being in a big crowd of people. *Id*. at 88-89.

### B.    <u>Medical Evidence</u>

**1.**

One-time examining physician Dr. Sethi evaluated Plaintiff in February 2005 in connection with his prior DIB application (which was denied in April 2005 and not appealed).  (Doc. #7, PageID at 47, 343-49).  Dr. Sethi diagnosed Plaintiff with a history of chronic arthritis in his knees and ankles, a past history of possible head injury (without neurological deficits), and a history of chronic alcohol and drug abuse (with no end stage complications).  (Doc. #7, PageID at 344).  Dr. Sethi opined that Plaintiff's "ability to do work-related physical activities such as sitting,

walking, lifting, carrying and handling objects and travelling is slightly limited….”
*Id.*, PageID at 345.

In April 2005, Dr. Sagone reviewed Plaintiff's medical records at the request of the Ohio Bureau of Disability Determinations. Based on Dr. Sethi's report, Dr. Sagone believed that Plaintiff's "physical limitations do not appear to be severe." (Doc. #7, PageID at 370).

Also in April 2005, Frank Orosz, Ph.D. reviewed Plaintiff's records and completed a psychiatric review technique form and a mental residual functional capacity form. *Id.*, PageID at 294-312. In doing so, Dr. Orosz indicated that Plaintiff suffered from Major Depression, Recurrent, and a substance abuse addition disorder – specifically, "Cocaine Abuse (early remission)." *Id.*, PageID at 355, 360. Dr. Orosz checked boxes indicating his opinion that Plaintiff had moderate restrictions of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. *Id.*, PageID at 362. Dr. Orosz explained, in part:

> The claimant's impairment does not meet or equal listings. As psyche CE [Consultative Exam] is the only medical evidence in the file (other than intake assessment from Lutheran Social Services). It is given considerable weight. The consultant opined that the claimant is capable of following instructions; his attention, concentration and immediate memory ability allow for the performance of repetitive tasks.

6

The claimant is capable of performing simple and moderately complex routine work, at a reasonable pace, occasional intermittent interactions with others and few changes.

(Doc. #7, PageID at 368).

Due to a robbery conviction, *see id*., PageID at 430, 488, Plaintiff was

incarcerated in the Allen Correctional Institution in Lima, Ohio "from October 16,

2006 until he received Judicial Release on June 9, 2008." *Id*., PageID at 420.  He

received mental health treatment from October 18, 2006 through July 12, 2007 after

which he was released into the general prison population.  Following his release

from incarceration on parole, *id*., PageID at 482, he was seen at the St. Rita's

Medical Center in Lima, Ohio.  An August 2008 clinical summary states, "This 46

year old … male was back in our Drug Rehabilitation Program, relapsing on

cocaine….  The patient is now completing a full rehab. Program and will enter a

long-term AA and NA recovery program with frequent meetings and ongoing

counseling." *Id*., PageID at 409.  Around this time, Plaintiff began mental health

treatment at the Shelby County Counseling Center.  *Id*., PageID at 413-26.  His

initial psychiatric evaluation diagnosed him with "Bipolar I disorder, mixed mood

with psychosis" and "polysubstance dependence, in remission, per self report."  *Id*.,

PageID at 480.  His mood was hypomanic and he reported anger and irritability with

poor frustration tolerance.  *Id*., PageID at 479.  His impulse control was poor.  The

evaluation report further indicates, "Psychosis:  Sees shadows in his peripheral vision.  He reports thinking others are talking about him, judging him negatively…."  *Id.*

In September 2008, clinical psychologist Dr. Boerger evaluated Plaintiff for the Ohio Bureau of Disability Determinations.  (Doc. #7, PageID at 487-94).  Dr. Boerger diagnosed Plaintiff with Major Depressive Disorder, recurrent, moderate; Anxiety Disorder NOS (not otherwise specified in the <u>Diagnostic and Statistical Manual of Mental Disorders</u>); and Personality Disorder NOS with anti-social and paranoid features.  *Id.*, PageID at 493.  His then-current Global Assessment of Function, or GAF, was 50,[2] generally referring to a person with "serious symptoms … or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)…."  <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at p. 34.

Dr. Boerger concluded that Plaintiff's ability to relate to others, including co-workers and supervisors, was moderately impaired; his ability to understand and follow instructions was moderately impaired; his ability to maintain attention to

_____

2  Health care clinicians perform a Global Assessment of Functioning to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Hash v. Commissioner of Social Sec.*, 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see also* <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at pp. 32-34.

perform simple tasks was moderated impaired; and his ability to withstand the pressure associate with day-to-day work activity was "moderately impaired as a result of depression, anxiety, and low frustration tolerance." (Doc. #7, PageID at 493).

Dr. Boerger also administered the Wechsler Adult Intelligence Scale, Third Edition, on which Plaintiff scored a verbal IQ of 67, a performance IQ of 75, and a full scale IQ of 68. *Id*., PageID at 491. Dr. Boerger explained, "Present test performance would appear to be a low estimate of [Plaintiff's] true intellectual potential. His educational background as well as general speech and mannerism suggest that his is of low-average range of intellectual abilities. Present scores may be lower as a result of low frustration tolerance as well as some attention and concentration problems." *Id*., PageID at 492.

In October 2008, psychologist and record-reviewer Dr. Hoyle completed a mental residual functional capacity form and a psychiatric review technique form. *Id*., PageID at 495-512. She expressed her opinions about Plaintiff's mental work abilities by checking boxes but she also provided a detailed explanation of her review. *See id*., PageID at 497. Dr. Hoyle concluded that Plaintiff's mental functioning – specifically, in the categories understanding and memory, concentration and persistence, social interaction, and adaptation – was either "not

significantly limited" or was "moderately limited."  *Id*., PageID at 495-96.  Dr.

Hoyle also believed that Plaintiff "is … capable of superficially interacting with the

public, including co-workers; able to maintain attention/concentration/

persistence/pace for simple, routine 1-2 step tasks.  He is best suited for work that

does not require strict production quotas or more than occasional adjustment to

change."  *Id*., PageID at 498.  According to Dr. Hoyle, Plaintiff's medically

determinable impairments "could reasonably be expected to produce [his] alleged

symptoms, but the intensity of the symptoms and their impact on functioning are not

consistent with the totality of the evidence.  The claimant's statements about his

symptoms and their functional effects are found to be only partially credible.

[Claimant] states that he doesn't like being around people and has paranoia.

However, he performs odd jobs such [as] washing cars and pulling weeds for

people.  Lives in a shelter and goes to church on Sundays.  Also attends AA

meetings and another AA member took him to the [consultative] exam."  *Id*.

Progress notes on November 13, 2008 from the Shelby County Counseling

Center document that Plaintiff's mood was depressed, his anger was well controlled,

his affect was fair, and he exhibited no psychosis.  (Doc. #7, PageID at 519).  He

engaged in generalized suicidal ideations but without any intent.  *Id*.  His GAF was

55, *id*., referring to "moderate symptoms … or moderate difficulty in social,

occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at p. 34.

In December 2008 psychologist Dr. Marlow reviewed Plaintiff's records and affirmed Dr. Hoyle's opinion.  Dr. Marlow did not explain her affirmance.  *Id*., PageID at 482.

In January 2009 a physician, Dr. Caldwell, reviewed the record and affirmed the prior assessment that Plaintiff did not have a severe physical impairment.  Dr. Caldwell did not explain her opinion.  *Id*., PageID at 540.

Plaintiff received treatment in late January and early February 2010 at the Upper Valley Medical Center in Troy, Ohio.   An emergency department physician reported on January 25, 2010, "This is a 51-year-old male who presents at the Crisis [sic] with suicidal thoughts depression related to feelings of hopelessness, and addiction.  The patient says on Wednesday, he had ingested Lexapro[,] Seroquel, Depakote and hopes that he just never woke up…. The patient presents … for treatment and evaluation."  (Doc. #7, PageID at 542).  "A urine drug screen [was] positive for cocaine metabolites, but no other drugs of abuse."  *Id*., PageID at 543. After evaluation and treatment, Plaintiff was discharged on February 1, 2010.  He was readmitted on February 2, 2010 "feeling hopeless and suicidal."  *Id*., PageID at

691. A physician assessed his GAF at 30, *id.*, PageID at 632, indicating "serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly in appropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at p. 34. After several days of treatment, Plaintiff was discharged on February 5, 2010. A physician recommended that he continue treatment in an outpatient setting at the Shelby County Counseling Center. His discharge diagnoses were Major Depression, recurrent, severe without psychosis and polysubstance dependence. (Doc. #7, PageID at 709. His GAF was 70, *id.*, referring to "no more than slight impairment in social, occupational, or school functioning…." <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at p. 34.

### 2.

In the present case, Plaintiff has submitted evidence that post-dates the ALJ's decision on August 13, 2010. Plaintiff's more recent evidence consists of a letter written by Dr. Pan in August 2011. (Doc. #2, PageID at 17; *see* Doc. #11). Dr. Pan explains that Plaintiff is being treated at the Shelby County Counseling Center for Bipolar Disorder, NOS. His medications include Buspar, Seroquel, Lexapro, Depakote, and Synthroid . Dr. Pan notes, "In spite of being on these medications,

[Plaintiff] continues having difficulty functioning.  He reports difficulty staying on task, concentrating, [and] problems with mood swings and irritability.  He also has low frustration tolerance.  He is having difficulty being around co-workers and making decisions.  He has problems functioning and holding a competitive job."  *Id*.

Plaintiff also relies on form titled "Medical Assessment Of Ability To Do Work-Related Activities" completed by Dr. Bohinc, who appears to be Plaintiff's primary care physician.  Dr. Bohinc's report is dated August 16, 2011; he concludes that Plaintiff is unable to work.  *Id*., PageID at 19-22.

In late April 2012, Plaintiff underwent cardiac stenting at the Good Samaritan Hospital.  (Doc. #13, PageID at 826-32).  In May 2012, he went for an office visit to the Upper Valley Cardiology in Troy, Ohio.  His diagnoses included coronary artery disease (primary), hypercholesteremia, anxiety, and an "Abnormal cardiac chath [sic]."  (Doc. #13, PageID at 823).  He was instructed to take his medications as directed and to "try to avoid high fat ('greasy') foods…." and to "[e]at  plenty of fruits and green leafy vegetables."  *Id*., PageID at 824.

## III.  Administrative Review

### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" as defined by the Social Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  The

definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  A "disability" consists of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70.  A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    <u>Social Security Regulations</u>

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence; *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?  The claimant's residual functional capacity is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.[3]

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### C.      **ALJ David A. Redmond's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2009 and had not engaged in substantial gainful activity "since April 15, 2005, the alleged onset date."  (Doc. #7, PageID at 64).

The ALJ found at Step 2 that Plaintiff has the severe impairments of "degenerative joint disease of the knees and ankles; internal derangement of the left knee; cognitive disorder; major depressive disorder; anxiety disorder; and personality disorder with a strong history of polysubstance abuse."  *Id*.

---

[3]  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

At Step 3 the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. #7, PageID at 67).

At Step 4 the ALJ assessed Plaintiff's Residual Functional Capacity as follows:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR  404.1567(b) and 416.967(b).  Giving the claimant the full benefit of doubt with regard to his allegations and subjective complaints, it is found that the claimant is limited to simple tasks that would afford him the opportunity to sit for 15 minutes of each hour.  He is further limited to jobs that would require no more than minimal personal contacts and that would not involve production quotas.

(Doc. #7, PageID at 67).   The ALJ also found that Plaintiff could not perform his past relevant jobs.  *Id*., PageID at 69.

At Step 5 the ALJ concluded that a significant number of jobs exist in the national economy that Plaintiff could perform, including mail clerk, laundry folder, copy machine operator, and warehouse clerk.  *Id*., PageID at 70.

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Social Security*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance ...." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by

substantial evidence, 'a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant

on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at

651 (quoting in part *Bowen*, 478 F.3d at 746; citing *Wilson v. Comm'r of Social*

*Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    <u>Discussion</u>

Plaintiff asserts, "the facts already presented plus Dr. Pan's diagnosis make it

… clear.  I presently am still taking my medication, and my physical activities are

limited."  (Doc. #8, PageID at 802).  He maintains that the ALJ misunderstood

during his prior appearance "before the Judge," presumably the ALJ.  *Id.*  Plaintiff

has also submitted a memorandum explaining his medical history and his current

medications.  He further states:

> I have always been able to support myself somehow and have
> never asked for handouts.  I grew up with a very strong work ethic and
> have taken on any kind of job to be self-sufficient.  I have not been able
> to do that lately….  I have been trying for years to gain employment
> but with all of my medications and physical limitations as well as my
> felonies, the opportunities have been very limited.  I have alienated my
> family and friends because of the choices I made in my past.  I do not
> socialize much with others.  The physical and mental limitations I have
> no control over, but I am desperately trying to function in this society.
> The medicines especially often make me tired and agitated.  I have
> sought out therapy and counseling to help deal with the intense anxiety
> and depressive disorders that I suffer from.  Not being able to work or
> get work with my limitations has been frustrating and defeating.  I want
> to rebuild my life but have been knocked down so many times it is hard

sometimes to get going…. I have paid for my mistakes over and over again, but now my body and mind won't let me function in the work force. I really need the Court's help. I desperately want to move forward and with the approval of my disability claim, the financial part alone could help me with that….

It is extremely difficult for me to concentrate and be attentive for periods of time. Dr. Pan's letter confirms this and I hope I am not denied again. I truly need assistance from Social Security ….

(Doc. #11, PageID at 817-18).

The Commissioner contends that the evidence Plaintiff has submitted in this case does not support a remand for further administrative proceedings under Sentence Six of 42 U.S.C. §405(g) because the evidence is not material to Plaintiff's condition before his date last insured (September 30, 2009).

The Commissioner next argues that substantial evidence supports the ALJ's decision. Although the Commissioner has neglected the issue of whether or not the ALJ applied the correct legal criteria, his support of the ALJ's decision is ultimately convincing.

The ALJ correctly described the legal criteria when discussing in great detail each step of the sequential evaluation mandated under Social Security Regulations. *See* Doc. #7, PageID at 62-63. The ALJ then applied the correct legal criteria at each sequential step. *See id*., PageID at 63-71. He correctly explained, moreover,

the legal standards applicable to evaluating Plaintiff's mental impairments and credibility.  *See id.*, PageID at 67-68.

Substantial evidence supports the ALJ's decision, most significantly his assessment of Plaintiff's residual functional capacity and credibility.  The ALJ relied in part on the opinions of Drs. Sagone and Sethi, who evaluated Plaintiff's physical work abilities at the request of the Ohio Bureau of Disability Determinations.  In doing so, the ALJ properly considered their opinions plus more recent medical evidence to conclude that Plaintiff was physically limited to light exertional work with the option to sit for fifteen minutes each hour.  *See* Doc. #7, PageID at 67-68; *see also* Social Security Ruling 96-6p, 1996 WL 374180 at *2 (non-treating medical sources are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act.").  The ALJ also did not blindly accept these reviewing physicians' opinions.  Instead, the ALJ found – in Plaintiff's favor – that he had certain severe physical impairments including degenerative joint disease in his knees and ankles, and an internal derangement in his left knee.  (Doc. #7, PageID at 64-65).  The ALJ considered these severe impairments when assessing Plaintiff's work abilities, i.e., his residual functional capacity, at Step 4 of the sequential evaluation and when considering whether jobs were available to Plaintiff at Step 5

of the sequential evaluation.  This analytical approach followed the required

sequential evaluation, *see* 20 C.F.R. §404.1520(a)(4), and was supported by

substantial medical evidence.

The ALJ also properly relied on Dr. Hoyle's opinions concerning Plaintiff's

mental work abilities.  (Doc. #7, PageID at 66-69).  Dr. Hoyle supported her

opinions with a detailed review of the record, and she explained the basis for her

opinions.  *See* Doc. #7, PageID at 495-512.   Her opinions were largely consistent

with Dr. Boerger's review and opinions.  The Regulations permitted the ALJ to

accept Dr. Hoyle's opinions for these reasons.  *See* 20 C.F.R. §404.1527(d)(3)-(4)

(requiring ALJs to consider the "supportability" and "consistency" of medical

source opinions); *see also* Social Security Ruling 96-6p, 1996 WL 374180 at *2.

And, the administrative record reviewed by the ALJ in August 2010 contained no

medical source opinions conflicting with those provided by Drs. Hoyle and Boerger.

Substantial evidence also supports the ALJ's decision to discount Plaintiff's

testimony concerning his physical and mental health and work abilities.  The record

supports the ALJ's recognition that Plaintiff responded positively when taking his

medications and that his medication caused no adverse side effects.  *See* Doc. #7,

PageID at 68-69.  The evidence also supports the ALJ's findings that Plaintiff's

impairments did not significantly impair his daily activities; he was independent in

self-care; he prepared simple meals for himself; he went grocery shopping; he did laundry; and – to Plaintiff's great credit – he regularly attended AA and NA meetings. The ALJ also correctly recognized that Plaintiff's hospitalizations in late January and early February of 2001 were connected, in part, to drug abuse, that he responded well to treatment, and that the record did not contain evidence indicating that he had been hospitalized for psychiatric care after his discharge in early February 2010. In light of this evidence the ALJ did not err in discounting Plaintiff's credibility and limiting him to jobs requiring no more than minimal interpersonal contacts and no production quotas. *See* Doc. #7, PageID at 67-69; *see also Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (If supported by substantial evidence, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.").

Turning to Step 5 of the sequential evaluation, the vocational expert's testimony concerning the jobs available to a hypothetical person with Plaintiff's work abilities and limitations constituted substantial evidence in support of the ALJ's conclusion that there are a significant number of jobs in the national economy that Plaintiff can perform. *See* Doc. #7, PageID at 70, 91-94; *see also Wright v.*

*Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (the ALJ was entitled to rely on the testimony of the vocational expert in reaching his decision.").

Lastly, Plaintiff's additional evidence was not part of the record the ALJ reviewed in August 2010 and on which the ALJ based his decision.  As a result, the evidence Plaintiff has submitted in this case may not be considered as within the administrative record for the purpose of judicial review.  *See Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1992); *Wyatt v. Secretary of Health & Human Services*, 974 F.2d 680, 685 (6th Cir. 1992).  The United States Court of Appeals for the Sixth Circuit has held that evidence submitted in the first instance to the Appeals Council or the District Court may only be considered in determining whether remand is appropriate pursuant to Sentence Six of §405(g).  *Casey*, 987 F.2d at 1233; *see Cotton*, 2 F.3d 692; *see also Wyatt*, 974 F.2d at 685.

A sentence six remand is warranted only upon a showing that the evidence is new, material, and that there is good cause for failure to incorporate the evidence into the record at the administrative hearing.  *Faucher v. Secretary of HHS*, 17 F.3d 171, 175 (6th Cir. 1994); *see Casey*, 987 F.2d at 1233.  A sentence six remand is not warranted in this case because Plaintiff's additional medical evidence does constitute material evidence.  "Evidence of a subsequent deterioration or change in

condition after the administrative hearing is deemed immaterial.'" *Jones v. Comm'r of Social Security*, 336 F.3d 469, 478 (6th Cir. 2003) (quoting *Wyatt*, 974 F.2d at 685).  Plaintiff's additional evidence concerns his deteriorating physical and mental health after the date of the ALJ's decision; it therefore fails to shine light on the severity of his impairments and disability status at the time of his claimed disability onset or at any later time up to the date of the ALJ's decision.  *See Jones*, 336 F.3d at 478; *see also Wyatt*, 974 F.2d at 685.  Although Plaintiff's additional evidence cannot be considered in the present case, Plaintiff still "has available the option of filing a new claim based on a different period of disability than the one considered here." *Jones*, 336 F.3d at 478.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's final non-disability decision be affirmed; and

2.      The case be terminated on the docket of this Court.


July 19, 2012

                         s/ Sharon L. Ovington
                          Sharon L. Ovington
                   United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).